**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Jeffery Caron and Spellbinders Paper Arts Company, LLC, an Arizona limited liability company,<br><br>                  Plaintiffs,<br><br>vs.<br><br>QuicKutz, Inc., a Utah corporation,<br><br>                  Defendant. | No. CV-09-02600-PHX-NVW<br><br>**ORDER** |

      Before the Court are QuicKutz's Motion for Summary Judgment of Unenforceability Due to Inequitable Conduct (Doc. 160), QuicKutz's Motion for Terminating Sanctions Based on Discovery Abuse (Doc. 164), Plaintiffs' Motion to Strike Inadmissible Exhibits and Argument (Doc. 168), and QuicKutz's Motion for Relief Under Rule 56(h) of the Federal Rules of Civil Procedure (Doc. 202).

## I.    BACKGROUND

      Mark Hixon and Natasha Hixon, co-founders of QuicKutz, Inc., filed a patent application under the Patent Cooperation Treaty in 2002 ("Hixon I") and a U.S. patent application with the United States Patent & Trademark Office ("PTO") in 2004 ("Hixon II"). On February 2, 2005, Plaintiffs James Jeffery Caron and Spellbinders Paper Arts Company, LLC, filed a patent application (serial no. 11/049,443) ("'443 Application") with the PTO that ultimately matured into U.S. Patent No. 7,469,634 ("'634 Patent").

On December 6, 2007, the PTO issued an Office Action in which claims 1-33, 39-43, 46, and 47 of the '443 Application were rejected.  Claims 5, 7-12, 19-21, 25, 32, and 40-43 were rejected in view of Hixon II, among other references.  On April 7, 2008, Plaintiffs filed a response to the Office Action, which was captioned "Amendment C."

On December 14, 2009, Plaintiffs initiated this lawsuit, alleging infringement of the '634 Patent.  On January 15, 2010, QuicKutz answered and filed a counterclaim seeking declaratory judgment that the '634 Patent is invalid and also seeking declaratory judgment that the '634 Patent is unenforceable for inequitable conduct.  The counterclaim alleged that Plaintiffs did not disclose to the PTO information regarding chemically etched dies sold by J. Michael Dywan to QuicKutz prior to the earliest priority date of the '634 Patent and that the information conflicted with arguments presented in Amendment C.

On October 22, 2010, the PTO rejected all 47 claims of the '634 Patent in a non-final office action.  On December 16, 2010, the Court stayed this case pending the PTO's reexamination of the '634 Patent.

On May 3, 2011, the PTO issued a non-final office action ("Second Office Action") in connection with a reexamination of the claims of the '634 Patent.  Claims 1-11, 13-28, 30-35, 44, 45, 47, 48, and 51 were rejected in view of Hixon I.  As a result of the rejection, Plaintiffs bore the burden of establishing the nonobviousness of the rejected claims.  On July 5, 2011, Plaintiffs filed a response to the non-final office action ("Second Response"), which included claim amendments.

On August 22, 2011, the PTO issued a Final Office Action confirming certain claims in the '634 Patent as patentable:   (a) embellishing methods that include embellishing or die cutting with an embellishing wall, embellishing or embossing with an aperture, and stenciling with the aperture (claims 29, 36, 43, and 49) and (b) die-forming methods involving simultaneous etching of an embossing aperture and an embellishing

wall (claims 37-42, 46, and 50).  The PTO rejected claims 1-11, 13-28, 30-35, 44, 45, 47, 48, and 51.

On October 24, 2011, Plaintiffs filed a response to the Final Office Action, which argued for patentability of claims 1-11 and 13-51 and included a declaration by Caron ("Caron 2011 Declaration").  Plaintiffs' response asserted that the '634 Patent was neither obvious in view of combining different embodiments nor a simple substitution of different embodiments of the primary alleged prior art reference, *i.e.*, Hixon.  On November 21, 2011, the PTO issued a Notice of Intent to Issue Ex Parte Reexamination Certificate, which confirmed the patentability of claims 1-11 and 13-51.  On November 28, 2011, as directed by the PTO, Plaintiffs submitted a clean claim set setting forth the text of the confirmed claims and showing all amendments made during reexamination.

On January 17, 2012, Plaintiffs filed their Amended Complaint.  On February 3, 2012, QuicKutz filed its Answer to the First Amended Complaint and its First Amended Counterclaim.  The First Amended Counterclaim alleges that Plaintiffs did not disclose to the PTO information regarding chemically etched dies sold by Dywan to QuicKutz prior to the earliest priority date of the '634 Patent, the information was material, and it was intentionally withheld from the PTO.  The First Amended Counterclaim also alleges that Hixon taught Dywan manufacturing techniques used to form an aperture in a media embellishing template by etching simultaneous to forming an embellishing wall, but Plaintiffs argued to the PTO in Amendment C that "it is not obvious to form an aperture in a media embellishing template, such as the template taught by Hixon, by etching simultaneous to forming an embellishing wall as claimed in claim 39."  It further alleges that Plaintiffs submitted declarations to the PTO in connection with the reexamination of the '634 Patent, but failed to disclose relevant relationships between the declarants and Plaintiffs.

## II. QUICKUTZ'S MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT (DOC. 160)

### A. Evidentiary Objection

Plaintiffs object to QuicKutz's Exhibits 14, 29, 32, and related argument because they were produced in *Caron, et al. v. Lifestyle Crafts, LLC*, No. CV12-0124-PHX-NVW, but not disclosed in this case. Plaintiffs are the same in both cases and have the same lead counsel in both cases. Exhibit 14 is Spellbinders' Responses to Lifestyle Craft LLC's First Set of Interrogatories. Exhibit 29 is a letter from QuicKutz's counsel to Plaintiffs' counsel seeking a supplemental response. Exhibit 32 is Spellbinders' Responses to Lifestyle Craft LLC's First Set of Requests for Admissions. Although the exhibits were exchanged in a different case, Plaintiffs undisputedly were aware of their own responses and admissions, and there would be no unfair surprise if the Court were to consider them. Therefore, Plaintiffs' objection is overruled. However, it is unnecessary to consider them to resolve the motion for summary judgment (Doc. 160), and the Court does not consider or rely on them in granting the motion for summary judgment.

### B. Legal Standard for Summary Judgment

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce evidence and show there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A genuine issue of material facts exists if there is evidence from which a jury could reasonably render a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact, one that might affect the outcome of the suit under the governing law. *Id.* On summary judgment, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the nonmoving party. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001).

- 4 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.      The Inequitable Conduct Doctrine

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability. . . ." 37 C.F.R. § 1.56(a).

The inequitable conduct doctrine provides courts with discretion to hold an entire patent unenforceable for misconduct before the PTO. *Therasense, Inc. v. Becton, Dickinson & Company*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). The doctrine requires a finding of both intent to deceive and materiality, proven by clear and convincing evidence. *Id.* District courts must find intent and materiality separately, *i.e.*, weighing the evidence of intent to deceive independently from analysis of materiality. *Id.* at 1290. If the accused infringer meets its burden of proof, the district court must weigh the equities to decide whether the patent applicant's conduct before the PTO warrants rendering the entire patent unenforceable. *Id.* at 1287.

To prevail on a claim of inequitable conduct, the accused infringer must prove by clear and convincing evidence that the patentee acted with the specific intent to deceive the PTO, *i.e.*, the patentee made a deliberate decision to withhold known material information. *Id.* A district court may infer intent from indirect and circumstantial evidence, but the specific intent to deceive must be the only reasonable inference that can be inferred. *Id.* "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91. Because the party alleging inequitable conduct bears the burden of proof, the patentee is not required to offer any good faith explanation unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence. *Id.* at 1291.

To prevail on a claim of inequitable conduct, the accused infringer also must prove but-for materiality by clear and convincing evidence. *Id.* at 1291-92. The district court must determine whether the PTO would have allowed the claim if it had been aware of

the undisclosed information.  *Id.* at 1291.  To determine patentability, the district court "should apply the preponderance of the evidence standard and give claims their broadest reasonable construction."  *Id.* at 1291-92.  The inequitable conduct doctrine should be applied only when the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim.  *Id.* at 1292.

The Federal Circuit recognizes an exception to the but-for materiality requirement in cases of affirmative egregious misconduct:

> When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.  After all, a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent.  Because neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality. . . .

> . . . [T]he materiality standard set forth in this opinion includes an exception for affirmative acts of egregious misconduct, not just the filing of false affidavits. Accordingly, the general rule requiring but-for materiality provides clear guidance to patent practitioners and courts, while the egregious misconduct exception gives the test sufficient flexibility to capture extraordinary circumstances.

*Id.* at 1292-93 (internal citations omitted).  Although a false affidavit or declaration is *per se* material, the accused infringer still must prove intent to deceive the PTO by clear and convincing evidence to invoke the inequitable conduct doctrine.  *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, No. 2009-1171, 2012 WL 4215890 (Fed. Cir. Sept. 21, 2012) (per curiam) (finding no clear and convincing evidence of intent to deceive the PTO where there was no evidence that anyone involved in the patent prosecution knew that the declaration of small entity status was false).

## D.   Analysis

QuicKutz alleges four inequitable acts:   (1) misrepresentations regarding J. Michael Dywan's status as inventor, (2) seven declarations of financially motivated

and/or unqualified individuals, (3) arguments to the PTO later contradicted by both inventors, and (4) the Caron Declaration (Exh. 26). The following analysis is based on undisputed facts.

### 1. Misrepresentations Regarding Dywan's Status as Inventor

On June 13, 2005, Plaintiffs filed with the PTO a "Declaration and Power of Attorney for Utility or Design Patent Application (37 CFR 1.63)," identifying Caron as the "First Joint Inventor" and Dywan as the "Second Joint Inventor."[1] The declaration was signed by James Jeffery Caron as "First Joint Inventor" and by J. Michael Dywan as the "Second Joint Inventor," with signatures dated June 9, 2005.

On June 4, 2007, Plaintiffs sought to have Dywan removed as an inventor in the '443 Application by submitting a "Request and Fee Deleting Incorrectly Named Person(s) Who Are Not Inventor(s) of Invention Now Being Claimed—Nonprovisional Application—(37 C.F.R. § 1.48(b))." The request stated that the amendment "is to delete the name(s) of the following person(s) named as Inventor(s) and who is (are) not the inventor(s) of the invention now being claimed: J. Michael Dywan." It also stated that the claims in the application were the originally filed claims 1-33 and 39-46 as amended on June 4, 2007.

On May 7, 2012, in a motion to the Court, Plaintiffs represented that Dywan was a previous owner and co-founder of Spellbinders and "was credited with co-inventor status" "[i]n exchange for his promised financial support of Spellbinders." The motion also states, "It is undisputed that Jeff Caron invented this product and that Mr. Dywan was added as an inventor solely based on his promises to provide financial support for

---

[1] A joint inventor or co-inventor is one who makes "a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention." *Caterpillar, Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004). A person is not a joint inventor or co-inventor if he only explains to the real inventors concepts that are well known in the current state of the art. *Id.*

accounts payable, meaning that given Mr. Dywan's minimal role, the documentation should be minimal, if not entirely non-existent."

On May 11, 2012, Caron testified that he had contacted other chemical etching vendors to inquire about their manufacturing chemically etched dies before he met Dywan of PMA Photometals.  Caron said he learned about chemical etching in vocational school, from discussions with Paul Winn of PMA Photometals, and from observing the operation of etching machines at PMA Photometals during the production of Spellbinders' dies at PMA Photometals.  Caron testified that Dywan's "sole contribution as an inventor to the claimed subject matter of the '634 patent was the flash etching of Claim 42."  Caron also testified that the primary reason for identifying Dywan as an inventor of the '634 Patent was his promise to provide financial support and that he did not think that Dywan invented anything.  Caron further testified that he sought to remove Dywan as an inventor of the '634 Patent because their business relationship was ending and Caron wanted to sever all ties with Dywan.

The petition to remove Dywan as an inventor was not granted, and the '634 Patent issued with him as a named inventor and claim 42 with its flash etching step among the listed claims.

### a.    Inventorship Is Material.

Plaintiffs first represented to the PTO that Dywan was a joint inventor and then represented to the PTO that Dywan was not an inventor.  Caron testified that he agreed to name Dywan as a joint inventor for financial reasons even though he does not think Dywan invented anything.  Because Dywan's inventorship was not removed from the patent, Plaintiffs say, "In the world of sports, this is called 'No Harm-No Foul.'"

"As a critical requirement for obtaining a patent, inventorship is material." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000).  A patent examiner must consider inventorship, and a full and accurate disclosure to the examiner of information related to inventorship is important.  *Id.* at 1322.  Even if

the inventorship of a patent as issued is correct, intentional falsehoods and omissions regarding inventorship may render the patent unenforceable for inequitable conduct. *Id.* Further, intentional misrepresentations may justify application of the inequitable conduct doctrine even if the claims to which they relate have been eliminated from the patent because "the issue is not inventorship per se, but misinformation about inventorship." *Id.*

Whether Dywan is a joint inventor of the '634 Patent is material. It is not necessary to find but-for materiality because clear and convincing evidence establishes that Plaintiffs engaged in an affirmative act of egregious misconduct.

### b.  Plaintiffs Intended to Deceive the PTO.

Plaintiffs did not provide the PTO with a full and accurate disclosure of information related to inventorship. Clear and convincing evidence establishes that Plaintiffs intentionally identified Dywan as a joint inventor of the '634 Patent primarily to obtain his financial support even though Caron did not believe Dywan invented anything. Further, clear and convincing evidence establishes that Plaintiffs intentionally represented to the PTO that Dywan was not a joint inventor of the '634 Patent for reasons entirely unrelated to whether Dywan in fact was a joint inventor. Plaintiffs intended to deceive the PTO by submitting inventorship information that suited their current interests without regard for its truthfulness.

### 2.  Declarations of Financially Motivated and/or Unqualified Individuals

On July 5, 2011, during reexamination of the '634 Patent, Plaintiffs filed seven declarations in support of their Second Response by Patent Owner to Office Action in Ex Parte Reexamination Pursuant to 37 C.F.R. § 1.530(d). QuicKutz contends that five of the seven declarations constitute "unmistakably false affidavits" because (1) Plaintiffs concealed from the PTO their financial relationships with three of the declarants (Gina Krupsky, Janine Blackwelder, Julie McGuffee) and (2) Plaintiffs misrepresented that two declarants (Dina Comaduran, Dr. A. L. Warkentin) had experience in the scrapbooking

industry.   The remaining two declarations accurately disclosed that the declarants (Jennifer Davis, Cathy Chlebana) were current or former employees.

The Second Response describes the declarations as follows:

> Attached hereto are declarations from individuals from different areas of the United States with experience in the arts and crafts and scrapbooking industry that are familiar in some way with the Spellbinders' combination dies.  The attached Exhibits are a collection of declarations from the following individuals:

> Exhibit 7 – Julie G. McGuffee, Fort Worth, Texas
> Exhibit 8 – Jennifer Davis, Wayne, Nebraska
> Exhibit 9 – Gina Krupsky, McFarland, Wisconsin
> Exhibit 10 – Dr. A.L. Warkentin, Yucaipa, California
> Exhibit 11 – Dina Comaduran, Covina, California
> Exhibit 12 – Janine Blackwelder, Pleasant Garden,
>            North Carolina
> Exhibit 13 – Cathy Chlebana, Chicago, Illinois

> Each declaration individually and independently describes that individual's experience in the scrapbooking industry as well as their familiarity with Spellbinders' product covered by the recited claims of the application under reexamination. The merits and nature of the claimed invention, as indicated by each declarant, are described to include a template or die having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture. Additionally, each declarant identifies that these die features and benefits are novel in their opinion and have never been commercialized in the scrapbooking industry before Spellbinders introduced this invention.

> . . . .

> Each Declarant has identified that the asserted merits and benefits of the product covered by the application under reexamination are due to the combination of both a cutting/embossing edge extending from one surface of a die and a separate embossing aperture.  The features are described to be a novel combination in the market and are embodied in each independent claim of this application.

Preceding the above-quoted excerpt, Plaintiffs provided information unrelated to the declarations to show that the commercial success of Spellbinders' combination dies is not due to any extraordinary marketing or advertising efforts.  Following the above-quoted excerpt, Plaintiffs stated:

> Moreover, the proof submitted by the Patent Owner and as discussed above provides ample evidence that the merits of the invention, not advertising or other extraneous commercial considerations, dictated the commercial success of the '634 patent. . . .

> For at least these reasons, it should be acknowledged that the asserted merits of the invention are commensurate with the scope of the claims such that a nexus exist[s] between the commercial success of the Spellbinders' combination dies and the novel features recited by the claims.

On December 20, 2011, the PTO issued a Notice of Intent to Issue Ex Parte Reexamination Certificate regarding the '634 Patent, which included a Statement of Reasons for Patentability and/or Confirmation. It stated, in part:

> Claims 1-11, 13-28, 30-35, 44-48, and 51 are confirmed/patentable for the following reasons: The examiner previously rejected the claims under 35 USC 103 as being obvious [] over the Hixon reference. PO had previously submitted evidence of commercial success regarding the claimed invention, which the examiner found lacking due to PO not establishing that the success was due to unclaimed features. Specifically, the claims were to a one piece system and the units for sale were multiple pieces. In response, PO has provided evidence that the multiple unit kits were the standard for sale in the field and therefore that the kits per se is not responsible for the success of the invention. In addition, PO has submitted evidence from multiple declarants as to the desirable characteristics of the claimed invention. It is the examiner's opinion that the evidence of secondary considerations outweighs the evidence of obviousness and therefore, the rejections are being withdrawn and the claims indicated to be Patentable.

Gina Krupsky is the owner of Gina K Designs. On July 19, 2011, Plaintiffs issued a press release announcing a partnership between Spellbinders and eight stamp design companies, which included Gina K Designs. Plaintiffs admit that they did not inform the PTO of the business relationship between Spellbinders and Krupsky/Gina K Designs. The declaration by Krupsky executed on June 17, 2011, which was submitted to the PTO, states she had worked in the scrapbooking and rubber stamping industry for more than ten years and:

> Spellbinders' introduction of dies having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture enabled me for the first time to emboss inside the cut edge of a die cut shape. They

also, for the first time enabled me to stencil and stamp inside the area that is open while the piece of cardstock is still inside the die. For the first time, I also could layer two dies together and cut them at the same time to create a frame with an open center. This was previously impossible because all other previously available dies had closed centers.

. . . .

Up until [I] found these Spellbinders dies, I had only ever seen dies that were solid with no opening. Spellbinders' dies enabled me, for the first time, to layer die cuts of the same shape, cut frames, emboss without cutting, emboss with cutting, stamp inside the die shape without removing the die and cut after the image was already stamped and line it up perfectly because I could see through the aperture. Previously, other dies were all closed.

During litigation, Krupsky produced another declaration, titled "Non-Obviousness Declaration Outline" and signed May 29, 2010, which states:

Spellbinders' introduction of dies having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture . . . enabled me for the first time to emboss inside the cut edge of a die cut shape.

. . . .

Up until I found Spellbinder's dies, I had only ever seen dies that were solid with no opening. Spellbinders dies enabled me, for the first time, to layer die cuts of the same shape, cut frames, emboss without cutting, emboss with cutting, stamp inside the die shape without removing the die and cut after the image was already stamped and line it up perfectly because I could see through the open center. Other dies were all closed.

Janine Blackwelder served as a member of the Design Team for Spellbinders in 2009. According to the "Spellbinders 2009-2010 Design Team Policies," Design Team members received cash compensation, a set of select Spellbinders products, a 50% discount on Spellbinders products, and a year-end bonus including "product, gifts and/or cash." Plaintiffs admit that they did not inform the PTO of Blackwelder's participation on the Design Team for Spellbinders. In April 2010 Blackwelder began an independent contractor relationship with one of Spellbinders' competitors, which evolved into a full-time employee relationship on August 1, 2011. Blackwelder's declaration, executed on

June 27, 2011, states she has worked in the scrapbooking industry for more than 15 years and is a free-lance designer.  It further states:

> Spellbinders' introduction of dies having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture enabled me for the first time to cut, emboss, and stencil a design with one die template.  The open design of the Spellbinders dies allows more options over dies with no opening.
>
> . . . .
>
> Up until I found these Spellbinders dies, I had only ever seen dies that were solid with no opening.  Spellbinders' dies enabled me, for the first time, to layer die cuts of the same shape, cut frames, emboss without cutting, emboss with cutting, stamp inside the die shape without removing the die and cut after the image was already stamped and line it up perfectly because I could see through the aperture.

Julie McGuffee claims on her website that Spellbinders is her client.  Plaintiffs admit that McGuffee was a paid consultant for Spellbinders in 2004-2005 and that they did not disclose to the PTO the past financial relationship between Spellbinders and McGuffee.  On May 1, 2011, and March 27, 2012, McGuffee invoiced Spellbinders for a small fee and expenses related to Design Team retreats in 2011 and 2012.  McGuffee's declaration, executed on June 20, 2011, states she had been in the arts and crafts industry for 20 years and the host of a television show for the past 14 years, which provided her opportunity to be aware of the tools and products available to scrapbookers and paper crafters since 1997.  McGuffee's declaration states that Spellbinders was the first company she was aware of that supplied a die that could both cut and emboss and that the "Spellbinders dies were easy to use and cost effective and afforded the crafter more flexibility in their creative works."

Dina Comaduran has been employed as a legal assistant since April 1980.  Her declaration, executed in June 2011, states that she has been active in scrapbooking for 15 years.  It states:

> Spellbinders' introduction of dies having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture enabled me for the first

1

2

time to cut, emboss, and stencil just by using one die, which I could not do with other dies previously available.  Before the introduction of the Spellbinders dies, I required two to four dies to accomplish the same job.

3

4

5

6

7

8

Dr. A. L. Warkentin was a special education teacher from 1969 to 2007 and is now retired from teaching.  Dr. Warkentin is a customer who purchases art supplies, including Spellbinders' products.  Her online businesses do not carry Spellbinders products, and her business is not associated with Spellbinders.  Dr. Warkentin's declaration, executed on June 17, 2011, states that she owns two online businesses that sell arts and crafts supplies and that she has been in that business for about ten years.  It states:

9

10

11

12

Spellbinders' introduction of dies having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture enabled crafters to do what had never been done before with dies from any other manufacturer.

13

. . . .

14

Crafters can use an individual die to do several things that had never been offered before by any other manufacturer.

15

16

**a.   Plaintiffs Misled the PTO Regarding Comaduran's and Dr. Warkentin's Qualifications.**

17

18

19

20

21

22

23

24

25

26

27

Plaintiffs represented to the PTO that the declarations were from individuals with "experience in the arts and crafts and scrapbooking industry that are familiar in some way with the Spellbinders' combination dies."  Comaduran has no professional experience in the "arts and crafts and scrapbooking industry."   Dr. Warkentin has professional experience in the "arts and crafts" industry, but not the part of the "arts and crafts" industry that uses Spellbinders' dies.  Both provided opinions using technical language that implied professional experience in the relevant industry rather than merely experience as a customer:   "Spellbinders' introduction of dies having both a cutting/embossing edge extending from one surface of the die and a separate embossing aperture . . . ."  As though she were knowledgeable about the history of the industry, Dr. Warkentin opined that Spellbinders' dies "enabled crafters to do what had never been

28

done before with dies from any other manufacturer."   Had the PTO known that Comaduran and Dr. Warkentin did not have professional experience in the relevant industry, it would have given little or no weight to their opinions, particularly regarding the novelty of Spellbinders' dies.

          **b.**    **Declarants' Financial Relationships with Spellbinders Are Material.**

      "Given the ex parte nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by the applicant."   *Ferring B.V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1187 (Fed. Cir. 2006).   "[A]t least where the objectivity of the declarant is an issue in the prosecution, the inventor must disclose the known relationships and affiliations of the declarants so that those interests can be considered in weighing the declarations."   *Id.* at 1195.   Failure to disclose a declarant's prior relationships with a patent applicant may constitute inequitable conduct.   *Id.* at 1187; *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 480 F.3d 1129, 1136 (Fed. Cir. 2007) ("In *Ferring B.V. v. Barr Laboratories Inc.*, we concluded that the failure to disclose possible bias of the declarants constituted a material omission where the declarations were submitted to overcome a prior art objection."); *see also Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1192 (Fed. Cir. 1993) ("We need not quibble about whether a 'consultant' is or is not 'employed' by a company.").

      Krupsky, Blackwelder, and McGuffee each had a financial relationship with Spellbinders.   Although Plaintiffs contend that the compensation each received was minimal, the evidence shows a basis for possible bias by each declarant.   Clear and convincing evidence shows each declarant had motivation to provide an opinion favorable to Plaintiffs' patent application.   The PTO was deprived of evidence that it needed to determine the weight it should give to the declarations by Krupsky, Blackwelder, and McGuffee.

1

### c.   The PTO Relied on the Declarations.

The PTO expressly relied on the declarants' assertions regarding non-obviousness. It previously had rejected Plaintiffs' claims as being obvious over the Hixon reference, but now found them patentable for two reasons.  First, previous evidence of commercial success had been found lacking because Plaintiffs had not established that the success was due to a one-piece system when it was sold in multiple unit kits.  Now Plaintiffs had provided evidence that multiple unit kits were the marketplace standard and that commercial success was not due to the kits themselves.

Second, Plaintiffs had "submitted evidence from multiple declarants as to the desirable characteristics of the claimed invention."  Plaintiffs contend that the declarations provided evidence of commercial success because of the dies' "desirable characteristics," which may be true, but the PTO concluded that "the evidence of secondary considerations outweighs the evidence of obviousness."  Moreover, the vast majority of the content of the declarations focuses on what can be done with Spellbinders' dies "for the first time."  One of the declarations is even titled "Non-Obviousness Declaration Outline."

Clear and convincing evidence establishes that Plaintiffs misled the PTO regarding the qualifications of Comaduran and Dr. Warkentin; Plaintiffs failed to disclose the financial relationships between Spellbinders and Krupsky, Blackwelder, and McGuffee; and the PTO reversed its rejection based on obviousness because of the declarations. Therefore, QuicKutz has shown clear and convincing evidence of the but-for materiality of Plaintiffs' failure to provide complete and accurate disclosures regarding the declarants.

### d.   Plaintiffs Intended to Deceive the PTO.

Plaintiffs submitted to the PTO declarations that are so similar to each other and to Krupsky's May 29, 2010 "Non-Obviousness Declaration Outline" that the Court concludes all of the declarations submitted to the PTO on July 5, 2011, were drafted in large part by Plaintiffs.  Plaintiffs affirmatively told the PTO that the declarations were

from individuals with "experience in the arts and crafts and scrapbooking industry that are familiar in some way with the Spellbinders' combination dies," but the declarations of Comaduran and Dr. Warkentin did not disclose that they did not have professional experience in the relevant industry. In fact, they implied the opposite. The declarations of Krupsky, Blackwelder, and McGuffee describe their lengthy experience in the arts and crafts and scrapbooking industry, but fail to disclose that their experience in the industry involved financial relationships with Spellbinders. Moreover, Plaintiffs submitted the declarations to overcome obviousness objections, and the PTO specifically found the declarations to be evidence outweighing the evidence of obviousness. The specific intent to deceive the PTO is the only reasonable inference that can be inferred from this evidence. Thus, the Court finds by clear and convincing evidence Plaintiffs acted with the specific intent to deceive the PTO by submitting the declarations of Comaduran, Dr. Warkentin, Krupsky, Blackwelder, and McGuffee.

### 3.   Arguments to the PTO Later Contradicted by Both Inventors

QuicKutz contends that both inventors, Caron and Dywan, have made sworn statements that arguments they submitted to the PTO in Amendment C are inaccurate:

> Furthermore, it is not obvious to form an aperture in a media embellishing template, such as the template taught by Hixon, by etching simultaneous to forming an embellishing wall as claimed in claim 39. Such a method requires precise control of the etching process so that the aperture is formed such that the aperture wall extends through the template body at the time that the embellishing wall reaches a desired height. For these reasons claim 39, as well as claims 41-45[,] are patentable.

The Declaration of J. Michael Dywan dated January 13, 2010, and submitted to the Court, states that the assertion quoted above "is incorrect and misleading." It also states that he did not review Amendment C and that it "was done" without his knowledge. But Dywan's conduct is not at issue here, and his opinion is disputed.

Caron testified that he could not testify as to the accuracy of the assertion quoted above because he is not skilled in the art of etching. He also testified that in his

experience with Spellbinders' products he had observed inadvertently created apertures that were formed at the same time as embellishing walls during a chemical etching process. These statements, however, are not clear and convincing evidence that Plaintiffs submitted false statements to the PTO.

On this issue, therefore, QuicKutz has not met its burden of showing by clear and convincing evidence that Plaintiffs submitted the above-quoted paragraph of Amendment C with specific intent to deceive the PTO or the materiality of such misconduct by clear and convincing evidence. Although QuicKutz's motion for summary judgment will be granted on other grounds, the summary judgment will not be based on Plaintiffs' submission of Amendment C to the PTO.

### 4.    The Caron 2011 Declaration

On October 24, 2011, Caron executed a declaration ("Caron 2011 Declaration") that was submitted to the PTO in support of its response to the Final Office Action, which requested the PTO to reconsider its decision to reject the '634 Patent in view of the prior art disclosed by Hixon I. The response to the Final Office Action stated that Caron "is a named inventor of the '634 patent and has firsthand knowledge of the method recited in at least allowable claims of 37-42 and 46" and "[i]n his opinion, the claimed combination of features cannot be created by a single etching step, when etching from one side, as taught by Hixon." In his declaration, Caron stated: "Hixon teaches dies having embossing features that are made by chemical etching from only one side of the die to form the embossing element." He also stated that the "claimed combination of features [in the '634 Patent] cannot be created by a single etching step, when etching from one side, as taught by Hixon."

### a.    Caron Misrepresented His Knowledge of Chemical Etching Either to the PTO or During Deposition.

Through his attorneys, Caron represented to the PTO that he had "firsthand knowledge of the method recited in at least allowable claims of 37-42 and 46." Claim 37 of the '634 Patent states:

A method of forming a one-piece dry embossing media embellishing template for embellishing media in a press having a template body with a first side and a second disposed opposite the first side comprising:

providing a template blank having a first side and a second side;

forming an embellishing wall extending from a first template body surface by etching; and

forming an aperture[2] in the first template body surface having an aperture wall extending through the template body by etching simultaneous to the step of forming the embellishing wall.

The Caron 2011 Declaration expressed to the PTO Caron's opinion that "the claimed combination of features cannot be created by a single etching step, when etching from one side, as taught by Hixon."

During a deposition on May 11, 2012, Caron was questioned about the assertion that he "has firsthand knowledge of the method recited in at least allowable claims 37 through 42 and 46." He responded: "I have knowledge of it. As far as me being any – any more than knowledge, that's – can't expand upon that." When asked how familiar he was with the fabrication processes used to produce chemically etched dies, Caron responded, "I've never had my hands on or operated a chemically etched machine in my life." When asked whether it was common to engage in multiple etching steps or in a single etching step, he responded, "I can't answer that because I'm not skilled in the art of etching." After claim 37 was read aloud in its entirety, Caron was asked if he was "familiar with the process that is being claimed in Claim 37." He responded, "I don't know, but it sure sounds good."

During the deposition, Caron was also asked about the Caron 2011 Declaration. When asked who wrote the declaration, he responded, "It would be comprised by me and

---

[2] As of Plaintiffs' October 24, 2011 response to the Final Office Action, claim 37 as amended included the word "embossing" before "aperture" here.

my IP counsel."  When asked whether he could identify any specific portions of the declaration that he wrote, he said, "Not at this time."

If Caron's 2011 representations to the PTO about his knowledge of the method recited in claims 37-42 and 46 are true, his deposition testimony was more than evasive; it was false or misleading.  If his deposition testimony was true and responsive, then his 2011 representations to the PTO are, at the least, misleading.

b.    **Caron Misrepresented to the PTO His Knowledge of Hixon.**

At the end of the Caron 2011 Declaration, Caron stated, "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."  The Caron 2011 Declaration includes a number of statements regarding Hixon, including that the PTO relied "on a combination of different embodiments of Hixon . . . to teach a die or template having the claimed features recited by the claims under re-examination."

When the PTO rejected all claims of the '634 Patent in a non-final office action on October 22, 2010, the examiner interpreted Hixon as not disclosing two-sided etching, but said it could be apparent that any or both sides may be etched.  Mark Hixon testified that at the time that Hixon I was submitted, he was aware that etching would occur from both sides.  Subsequently, after reviewing the entirety of Hixon I, Mark Hixon executed a declaration stating that he strongly disagreed with the assertion "that all embossing features taught in Hixon I are formed by 'chemical etching from only one side of the die.'"  He further stated that "there is no basis in Hixon I for an argument that the formation of design elements for embossing is limited to etching from a single side" and "the teachings of Hixon I are not confined to forming embossing elements by etching from a single side of a workpiece."

Caron disagrees with both the PTO examiner's and Mark Hixon's interpretations of Hixon.  Paragraph 6 of the Caron 2011 Declaration states:  "Hixon teaches dies having embossing features that are made by chemical etching from only one side of the die to

form the embossing element."  Paragraph 8 states, in part:  "The claimed combination of features cannot be created by a single etching step, when etching from one side, as taught by Hixon."  Paragraph 9 states:  "To create the claimed features on the same one-piece die by etching from only one side, as taught by Hixon, requires a multiple-step etching process that is subject to substantial technical difficulties."

During deposition, Caron was asked whether he had read Hixon I.  He responded, "As much as I could understand of it, yes."  He also was asked whether paragraph 6 of the Caron 2011 Declaration expressed his understanding of the teachings of Hixon, and he responded affirmatively.  Then Caron was asked whether he could "point to a location in the Hixon reference that supports that understanding."  Caron responded:  "No.  I'm not going to review the document here and take up the rest of our time."  When asked if he could find portions of Hixon that he believed supported his assertion in paragraph 6 of the Caron 2011 Declaration, he responded, "With adequate time."  When told that the parties had requested elaboration on paragraph 6 and Caron's counsel had indicated such elaboration would not be forthcoming, Caron said he was "presently unwilling" to identify the portions of Hixon that support his assertion in paragraph 6 of the Caron 2011 Declaration.

In the Caron 2011 Declaration, Caron declared certain things to be true, including that "Hixon teaches dies having embossing features that are made by chemical etching from only one side of the die to form the embossing element" and other facts about chemical etching and Hixon's teachings.  The evidence submitted here establishes that he did not know those things to be true when he made the 2011 declaration and may not even now.

### c.    The Caron 2011 Declaration Is an Affirmative Act of Egregious Misconduct.

The Caron 2011 Declaration satisfies the exception to the but-for materiality requirement because it is an "unmistakably false affidavit," constituting an affirmative act of egregious misconduct because it misrepresented that it conveyed information that the

declarant knew to be true and was submitted to the PTO with the misrepresentation that the declarant had firsthand knowledge about the subject of the declaration. For the purpose of deciding the present motion for summary judgment, it is not necessary to decide whether the substantive content of the declaration is false.

### d.   Plaintiffs Intended to Deceive the PTO.

Clear and convincing evidence establishes that the Caron 2011 Declaration was submitted to the PTO for the purpose of convincing the PTO to reverse its rejection of the claims under reexamination in view of Hixon. On its face, the Caron 2011 Declaration establishes that the specific intent to deceive is the only reasonable inference that can be inferred.

### 5.   Weight of the Equities

Plaintiffs have aptly captured their interpretation of the duty of candor and good faith in dealing with the PTO: *No harm, no foul.* They contend that the truthfulness of their conflicting representations to the PTO regarding inventorship of the '634 Patent is unimportant because the PTO did not act on them. They contend their failure to disclose their financial relationships with declarants does not matter because the financial incentives were minimal. They contend their presentation of declarations from customers without "industry experience" was literally truthful. They defend the Caron 2011 Declaration by attempting to distinguish what he said from what his attorneys said and by arguing that his attorneys did not literally state that the declaration was based on his firsthand knowledge, just that he had it. Finally, they reason that QuicKutz has not shown that the Caron 2011 Declaration is without basis or foundation because there may be a factual dispute regarding the teaching of Hixon I — attempting to avoid the fact that they refused to disclose *any* basis for Caron forming any opinion on any teaching of Hixon I. Their actions show that they interpret Caron's oath under penalty of perjury also as unimportant.

1
2
3
4
5
6
7
8
9
10
11

Under the inequitable conduct doctrine, when an accused infringer meets its burden of proving the applicant's intent to deceive and materiality by clear and convincing evidence, the district court must weigh the equities to decide whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable. *Therasense*, 649 F.3d at 1287. QuicKutz has proven Plaintiffs' intent to deceive and materiality by clear and convincing evidence. No evidence before the Court weighs against rendering the entire patent unenforceable. Therefore, having found by clear and convincing evidence that Plaintiffs' misconduct was material and that they intended to deceive the PTO, the '634 Patent is held unenforceable under the inequitable conduct doctrine, and QuicKutz's Motion for Summary Judgment of Unenforceability Due to Inequitable Conduct (Doc. 160) will be granted.

12
13

### III. QUICKUTZ'S MOTION FOR TERMINATING SANCTIONS BASED ON DISCOVERY ABUSE (DOC. 164)

14
15
16
17
18
19
20

QuicKutz seeks dismissal of this action with prejudice and award of fees under the court's inherent power as remedy for Plaintiffs engaging "deliberately in deceptive practices that undermine the integrity of judicial proceedings." *See Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). Pursuant to its inherent power, a district court may dismiss an action as a sanction for a party's misconduct due to willfulness, fault, or bad faith. *Id.* Before imposing such a harsh sanction, the court must weigh the following factors:

21
22
23

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

24
25
26
27

*Id.* Further, there must be "a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case." *Id.* (internal quotation marks, alteration, and citation omitted).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

QuicKutz does not allege that Plaintiffs violated a court order and therefore does not seek sanctions under Fed. R. Civ. P. 37(b)(2).  Also, it does not expressly request sanctions under Rule 37(c)(1)(C), which would permit dismissal of this action for failure to disclose or supplement information as required by Rule 26(a) or (e).

QuicKutz contends that, among other things, Plaintiffs' untimely production of a key deposition transcript after the end of fact discovery precluded its use during Caron's deposition in this action, causing irreparable prejudice, and that this case should not go to trial merely because Caron's conflicting declarations and testimony create an illusion of issues of material fact.  In response, Plaintiffs argue that they did not violate any specific court order, they were unable to produce some responsive documents because they failed to preserve a computer and a BlackBerry phone, their production delays were nominal, and QuicKutz should have pursued discovery disputes before the close of discovery on May 25, 2012.

Several of the instances of alleged discovery misconduct are directly probative of the date of conception of the '634 Patent.  On April 2, 2010, QuicKutz requested production of all documents related to the conception of the subject matter of the '634 Patent and all documents evidencing any testimony or depositions from any litigations regarding the '634 Patent.  During his May 11, 2012 deposition, Caron referred to being deposed related to a claim by a former business associate that she had invented Spellbinders' dies.  Plaintiffs had not disclosed Caron's prior deposition testimony to QuicKutz.  On May 16, 2012, QuicKutz requested production of the deposition transcript. Plaintiffs refused, contending that it was not responsive to the production request. Plaintiffs' counsel indicated that the requested transcript was in his possession.  On May 30, 2012, the Court ordered Plaintiffs to produce the transcript.  Despite that fact discovery already had closed on May 25, 2012, Plaintiffs did not produce the transcript to QuicKutz until June 12, 2012.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      The April 29, 2010 deposition transcript showed that Caron had testified that he met Dywan of PMA Photometals the end of November 2004, and they communicated regarding making dies.  Caron testified that he had an epiphany in which he conceived of putting an aperture all the way through the die and said that he would never forget the moment he told Dywan what he wanted him to do.  He further testified that two or three days later he received an email from Dywan saying it worked and that "that was the start of the Spellbinders style dies as we produce them today."

      Two years later, on May 4, 2012, QuicKutz notified Plaintiffs that products sold by DayCo under the name Zip'eCuts were on sale at least as early as Fall 2004.  It provided Plaintiffs with photographs and descriptions of the products, which appeared to use apertures in connection with embellishing dies.  It noted that only one of the applications by which the '634 Patent claimed priority contained disclosure relating to embellishing dies including apertures and that application was filed on November 12, 2004.  On May 8, 2012, Plaintiffs produced for the first time prototypes that Caron said he created between April 6, 2004, and April 13, 2004.

      During his May 11, 2012 deposition, Caron was asked whether he recalled a specific time when the thought came to him of using an aperture for embossing.  He testified that it was some time before the actual prototypes, sometime in "probably 2003."  When asked if he could narrow that down to early or late 2003, Caron responded, "I answered your question to the best of my ability today."  He testified that the prototypes he produced on May 8, 2012, were retained in a house he owns in Ohio where his mother-in-law and father-in-law live.  When asked when he began trying to locate the prototypes, Caron responded, "When we started getting serious about this case."  When the question was repeated, he said, "I've always been looking for the prototypes.  Like I said, they've been in numerous boxes. . . . I've looked for prototypes for years."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In a declaration dated August 8, 2012, Caron said that after the stay of this case was lifted in December 2011,[3] he made repeated efforts to look for documents and information.  He said that their ability to find responsive materials was hampered by Spellbinders' computer system crashing in 2010.  He also said that they had no means of finding responsive emails on Mrs. Caron's BlackBerry phone because it was traded in for an iPhone in approximately August 2011.  Caron further stated that when he learned that discovery was closing in May 2012,[4] an additional search was conducted in Ohio, the prototypes were found, and they were shipped overnight to Arizona for inspection by QuicKutz's counsel on May 8, 2012, three days before Caron's deposition.

The April 29, 2010 deposition transcript also showed that Caron had testified that he was aware that Dywan of PMA Photometals was making dies for QuicKutz before he approached Caron to make dies for Spellbinders.  He confirmed that statement during his May 11, 2012 deposition, yet Plaintiffs' February 21, 2012 responsive pleading represents that they lack "knowledge of any information pertaining to any chemically etched dies sold by Mr. Dywan to QuicKutz at any time prior to the earliest priority date of the '634 Patent (and any time thereafter), other than Mr. Dywan's self-serving declaration. . . ."  They also represented in their responsive pleading that Spellbinders had

---

[3] Plaintiffs initiated this action on December 14, 2009.  On January 19, 2010, the Court ordered parties to provide initial disclosures no later than March 5, 2010.  On March 9, 2010, the Court denied QuicKutz's motion to stay discovery and all deadlines and emphasized the importance of initial disclosures and a case management plan.  On June 14, 2010, the Court denied further motions by QuicKutz for stay pending the outcome of reexamination proceedings.  Finally, on December 16, 2010, the Court granted QuicKutz's renewed motion to stay litigation pending outcome of reexamination of the '634 Patent because the PTO had rejected all 47 claims of the patent in a non-final office action and it appeared likely a stay would simplify the issues in question and potential trial.  On December 20, 2011, the litigation resumed.

[4] On December 20, 2011, the close of fact discovery was set for May 25, 2012.

not retained McGuffee in the past seven years even though McGuffee invoiced Spellbinders for her services and expenses in 2011 and 2012.

Plaintiffs do not explain why they did not attempt to find responsive materials before the stay imposed on December 16, 2010, why they did not preserve the computer system that crashed in 2010 or the BlackBerry phone with relevant emails, or why it took more than four months to search for prototypes stored in a residence owned by Caron. Nor do they attempt to reconcile Caron's conflicting deposition testimony regarding when he first conceived of using apertures in connection with embellishing dies. Regarding their failure to produce Mrs. Caron's email and a timeline, they say they cannot produce documents to which they do not have access. Regarding delayed production, they say the delay was nominal and any overlooked items were produced promptly after they were notified of the oversight. Regarding "alleged inconsistencies within various documents and depositions," Plaintiffs respond, "Such is the stuff, where proper, of cross examination and impeachment during trial rather than discovery motions or sanctions."

Plainly, evidence relevant to the date of conception of the '634 Patent is critically important to the matters in controversy in this litigation. Caron is the source and keeper of much of this critically important evidence. He is a listed inventor of the '634 Patent and the owner of the entire right, title, and interest in and to the '634 Patent. He is a Plaintiff and the chief executive officer of the other Plaintiff, and he repeatedly opposed staying discovery. Yet between April 2, 2010, when QuicKutz requested production of all documents related to the conception of the subject matter of the '634 Patent, and December 16, 2010, when QuicKutz's motion for stay was granted, Caron did not "get serious" about this case. By his own account, he did not preserve a "crashed" computer system with responsive documents. He did not search for prototypes stored in a residence he owned. And during this period between the production request and the stay, Caron testified that he would never forget the moment in late November 2004 when he

conceived of putting an aperture all the way through the die.  His May 2012 recovery of the prototypes and inability to remember the moment he would never forget establish that Plaintiffs willfully and in bad faith violated the rules of discovery by withholding critical evidence responsive to discovery requests.

This case is nearly three years old.  Plaintiffs have delayed production and/or failed to preserve evidence essential for fair adjudication.  Although public policy favors disposition of cases on their merits, doing so here would require re-opening discovery. Any efforts to cure the prejudice to QuicKutz likely would be inadequate and necessarily would cause delay, which would adversely affect the public's interest in expeditious resolution of litigation and the Court's need to manage its dockets.  Further, any sanction short of dismissal, such as excluding Plaintiffs' evidence regarding the date of conception of the '634 Patent, would eliminate any possibility of Plaintiffs succeeding at trial. Moreover, Plaintiffs' pattern of deception and discovery abuse make it impossible to conduct a trial with any reasonable assurance that the truth will be available.  *See Anheuser-Busch*, 69 F.3d at 352.

Therefore, QuicKutz's Motion for Terminating Sanctions Based on Discovery Abuse (Doc. 164) will be granted, dismissing this action with prejudice under the Court's inherent power as remedy for alleged discovery misconduct by Plaintiffs.

Also, Plaintiffs move to strike QuicKutz's Exhibit D and pages 3-5 of Exhibit K and related argument because they were produced in *Caron, et al. v. Lifestyle Crafts, LLC*, No. CV12-0124-PHX-NVW, but not disclosed in this case.  (Doc. 168.)  As previously noted, Plaintiffs are not unfairly surprised by their own responses to interrogatories and related communications, and the motion to strike will be denied. However, the Court has not considered QuicKutz's Exhibit D and pages 3-5 of Exhibit K and related argument to decide this motion for discovery sanctions (Doc. 164).[5]

---

[5] These exhibits show that Spellbinders identified milling equipment owned by Mercury Machine Company among equipment it used in the production of products covered by the '634 Patent.  Two weeks later, during his May 11, 2012 deposition, Caron

## IV.   QUICKUTZ'S MOTION FOR RELIEF UNDER RULE 56(h) OF THE FEDERAL RULES OF CIVIL PROCEDURE (DOC. 202)

QuickKutz seeks sanctions under Rule 56(h) of the Federal Rules of Civil Procedure against Plaintiffs for submitting a declaration ("Caron 2012 Declaration") (Doc. 172) in response to QuickKutz's Motion for Summary Judgment of Unenforceability Due to Inequitable Conduct (Doc. 160) in bad faith or solely for delay.  The sanctions sought include striking or disregarding the declaration and awarding QuickKutz its fees and expenses incurred as a result of the declaration.  Rule 56(h) provides:

> If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result.  An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

QuickKutz contends that Plaintiffs' October 22, 2012 admissions in *Caron, et al. v. Lifestyle Crafts, LLC*, No. CV12-0124-PHX-NVW, contradict the following statements from the Caron 2012 Declaration:

> "Spellbinders has paid no cash or in kind compensation to Ms. Krupsky at any time."

> "Beyond the press release itself, which merely authorized eight stamp companies to use certain Spellbinders' designs, there has been no interaction, collaboration or incentive provided by Spellbinders to Gina K. Designs or its owner, Ms. Krupsky."

> "Spellbinders has not provided Ms. Krupsky personally with any Spellbinders product at any time."

> "Ms. McGuffee has been paid no other compensation, cash or in-kind, since 2005 when she last provided consulting services to Spellbinders.   Ms. McGuffee had not been retained as a consultant for Spellbinders for over seven years before the signing of her June 2011 declaration."

In response to the Rule 56(h) motion, Plaintiffs do not address Rule 56(h), but rather contend that the Ninth Circuit general rule that a party cannot create an issue of

---

testified that he did not use his former employer Mercury Machine's tools to create dies.

fact by an affidavit contradicting his prior deposition testimony does not apply here. They further contend that the admissions on which QuicKutz relies are not authenticated and thus not admissible on summary judgment.  However, they do not dispute the admissions' authenticity.

Rather, Plaintiffs contend that both the Caron 2012 Declaration and the *Lifestyle Crafts* discovery responses are true and that there is no "flat contradiction."  First, they say Caron "accurately stated in his affidavit that no compensation of any nature was paid to Ms. Krupsky at any time."  He "reiterates his testimony that no payment was made to Ms. Krupsky in exchange for her testimony at any time"—which is not the issue. Plaintiffs also state that "the *Lifestyle Crafts* discovery responses make clear that no items were sent to Ms. Krupsky, but were sent to her company."  But if items were sent to her company, that relationship should have been disclosed to the PTO, and the statement in the Caron 2012 Declaration does not serve a good faith purpose.  Further, Plaintiffs contend that "if a Spellbinders employee was carrying out her marketing duties by interacting with other businesses within the craft industry, Mr. Caron is not aware of the details of such activities. . . ."  In other words, Caron did not have personal knowledge to state that "no compensation of any nature was paid to Ms. Krupsky at any time."

Second, Plaintiffs contend that Caron's assertion "Beyond the press release itself, …, there has been no interaction, collaboration or incentive provided by Spellbinders to Gina K. Designs or its owner, Ms. Krupsky," means "there has been no interaction, collaboration, incentive of which he is aware regarding the press release."  "No interaction beyond the press release" cannot mean "no interaction regarding the press release."  Further, Plaintiffs say "Caron admits, as he would have to in any organization the size of Spellbinders, that if an employee within Spellbinders was interacting with Gina K. Designs, he was unaware of any such activities."  Again, Caron admits to not having personal knowledge of whether or not Spellbinders had interactions with Gina K. Designs despite having authored a declaration on the subject.  And Plaintiffs admitted

Spellbinders did have interactions with Gina K. Designs in their *Lifestyle Crafts* admissions.

Third, regarding Caron's statement that "Spellbinders has not provided Ms. Krupsky personally with any Spellbinders product at any time," Plaintiffs correctly note that the discovery request asked for admission that Spellbinders wrote to Krupsky stating that products were being shipped to Krupsky and her design team.  It did not ask Plaintiffs to admit that in fact the products were shipped to Krupsky.  Further, the related admissions state that products were provided to Krupsky "as head of Gina K. Designs, not personally."  Thus, the *Lifestyle Crafts* admissions do not literally contradict Caron's statement.  However, his statement serves no good faith purpose if limited to its literal boundaries.

Fourth, Plaintiffs contend that the *Lifestyle Crafts* admissions do not literally contradict Caron's statement that "McGuffee has been paid no other compensation, cash or in-kind, since 2005" because the 2006 invoice was sent by Kievlan-McGuffee Design Services, Inc., and paid to Kievlan-McGuffee Design Services, Inc., and the 2010 invoice was sent by Julie G. McGuffee, K-Mc Design Services, Inc., and paid to Julie G. McGuffee, K-Mc Design Services, Inc.  Thus, Plaintiffs contend, "Spellbinders and Mr. Caron correctly state Ms. McGuffee was not paid directly, and accurately state another person, a corporation was paid."  Although Plaintiffs defend the meaningful distinction between a corporation and its shareholders, they ignore the context here, *i.e.*, that Plaintiffs submitted a declaration from McGuffee to the PTO without disclosing any financial relationship between her (or her corporation) and Spellbinders.  The Caron 2012 Declaration describes $250.00 paid to McGuffee in 2011 ("some $100.00 was for expenses") and reimbursement for travel expenses in 2011 and 2012, states she had been paid "no other compensation" since 2005, and states that Caron did not disclose to the PTO the McGuffee interactions with Spellbinders "because the amount was so trivial [] that I had not been advised of the $150.00 in training fees for 20 hours of work."  The

fact that Spellbinders paid McGuffee's corporation and did not pay McGuffee personally does not justify Caron's failure to disclose to the PTO Spellbinders' financial relationship with McGuffee. Therefore, the only purpose for including the statement that "McGuffee has been paid no other compensation, cash or in-kind, since 2005" in the Caron 2012 Declaration would be to mislead the Court.

Plaintiffs also contend that the Court should not consider the *Lifestyle Crafts* admissions because the admissions were made five months after discovery closed in this case. They are concerned that if "Defendant is allowed to continue its efforts at having a 'second shot' at discovery in this case by pursuing its discovery through the *Lifestyle Crafts* case, then Defendant's tactics are likely to increase, not abate." However, because Plaintiffs defend their admissions as true, there is no prejudice resulting from their use, and there need be no concern about QuicKutz continuing to pursue discovery in this case through the *Lifestyle Crafts* case because this case will be closed.

Therefore, the Court finds that the Caron 2012 Declaration was submitted in bad faith and will strike it pursuant to Fed. R. Civ. P. 56(h). Although the Court will strike the declaration because it was submitted in bad faith, it is not necessary to do so in order to grant summary judgment of unenforceability due to inequitable conduct because the summary judgment is based entirely on evidence independent from the Caron 2012 Declaration that Plaintiffs do not dispute.

The Court declines QuicKutz's requests for attorneys' fees under Rule 56(h) and under the Court's inherent power to sanction discovery abuse. If QuicKutz seeks award of attorneys' fees under other applicable law, it may include fees incurred related to its motions for Rule 56(h) and discovery abuse sanctions then.

IT IS THEREFORE ORDERED that QuicKutz's Motion for Summary Judgment of Unenforceability Due to Inequitable Conduct (Doc. 160), QuicKutz's Motion for Terminating Sanctions Based on Discovery Abuse (Doc. 164), and QuicKutz's Motion

for Relief Under Rule 56(h) of the Federal Rules of Civil Procedure (Doc. 202) are granted.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Inadmissible Exhibits and Argument (Doc. 168) is denied.

IT IS FURTHER ORDERED that the Declaration of James Jeffery Caron in Opposition to QuicKutz's Motion for Summary Judgment of Unenforceability (Doc. 172) is ordered stricken.  The Clerk shall leave the imaged document in the electronic record.

IT IS FURTHER ORDERED that judgment is entered in the form of the separate judgment filed herewith.  The Clerk shall terminate this case.

Dated this 13th day of November, 2012.

_____
Neil V. Wake
United States District Judge